COMMONWEALTH *vs.* STANLEY WEBB.

No. 06-P-535.

Bristol. December 6, 2006. - February 5, 2007.

Present: GELINAS, GREEN, & GRAINGER, JJ.

Further appellate review granted, 449 Mass. 1101 (2007).

*Lottery.*

At the trial of complaints charging the defendant with setting up or promoting a lottery, in violation of G. L. c. 271, § 7, the Commonwealth failed to demonstrate a required element of the offense, namely, that a price had to be paid to participate in the game, and therefore, this court reversed the judgments of conviction. [170-172]

COMPLAINTS received and sworn to in the Fall River Division of the District Court Department on February 26 and 28, 2002.

The cases were heard by *Brian F. Gilligan,* J.

*Dana Alan Curhan* for the defendant.

*Steven E. Gagne,* Assistant District Attorney, for the Commonwealth.

GREEN, J. For whatever reason, the Commonwealth failed to develop through its investigation, or to present at the defendant's trial, evidence establishing one of the three required elements of the charge of setting up or promoting a lottery, under G. L. c. 271, § 7.[1] We are accordingly constrained to reverse the

---

[1]The defendant does not challenge that the evidence established that the video gaming machines his company developed and deployed satisfied two of the three elements required by the statute: (1) the opportunity to win a prize, (2) with the result dependent on or determined by chance. See *Commonwealth* v. *Lake,* 317 Mass. 264, 267 (1944); *Commonwealth* v. *Frate,* 405 Mass. 52, 54 (1989). However, the defendant contends, and we agree, that the evidence failed to satisfy the third element of the offense: that a price be paid to participate in the game. See *Commonwealth* v. *Lake, supra; Commonwealth* v. *Frate, supra.*

judgments of conviction entered against the defendant on two complaints under that statute.[2]

*Background.* The defendant is the sole stockholder and occupies all executive offices in Nutel Communications, Inc. (Nutel), a Massachusetts corporation.[3] In that capacity, the defendant facilitated the development of the two machines from which the complaints arose. Both machines allow users to play one of a variety of games using a video monitor.[4] As developed and promoted, the games were used to promote the sale of telephone calling cards. One of the machines took cash, and dispensed paper slips with telephone access code numbers. Upon completion of the calling card sale, game credits posted to the machine. The other machine neither took cash nor dispensed calling card slips; instead, the calling card purchase occurred through an attendant who, upon completion of the transaction, posted game credits to the machine. Depending on the player's success at a game, the player could become eligible for a prize, either in the form of cash or a gift certificate.[5] Nutel arranged the placement of the machines in various establishments in the city of Fall River, and agreed to split the cost of prizes evenly with the proprietors of those establishments.

Based on information alleging an illegal gaming operation, Fall River police conducted an undercover investigation in early 2002. At one establishment, Sergeant Paul Gauvin observed a man insert money into a slot of a Nutel machine and play for about twenty minutes. Thereafter, the man removed paper slips from the bottom of the machine and exchanged them with the bartender for cash. At a second establishment, Gauvin saw a

---

[2]Two counts each of use of an illegal gaming instrument and keeping an unlicensed amusement game were dismissed before trial. At the close of the Commonwealth's case-in-chief, the judge granted the defendant's motion for directed verdicts on two counts of knowingly permitting a lottery in a building within the defendant's control and two counts of keeping a common gaming house.

[3]The defendant asserts no claim that he may not be held liable for any criminality in the arrangement Nutel promoted.

[4]Some of the games involved simulated playing cards, while others simulated roulette or other games of chance.

[5]We note that it is immaterial for purposes of the statute whether an award takes the form of cash or gift certificates; any item of value is sufficient to satisfy the statutory element of a prize.

man hand a twenty dollar bill to the bartender, whereupon the bartender pushed buttons on a control panel to activate the machine. After playing the machine for about twenty minutes, the man returned to the bartender, who paid him one hundred dollars.

Gauvin himself played the machines at each establishment. At the first establishment, Gauvin attempted to play the machine by simply pushing the buttons, but was unable to cause the machine to activate. However, when he inserted twenty dollars into the machine, one hundred credits posted to the machine. Gauvin played the game until those credits were exhausted, and then inserted another twenty dollars and received another one hundred credits. After playing for a time, Gauvin had accumulated a surplus of credits, and he pressed a button to stop playing. The machine dispensed a number of paper slips with telephone access code numbers and a slip stating the number of "credits" he had accumulated. Gauvin redeemed the credits with the bartender for a gift certificate for that establishment in the amount of thirty-two dollars. At the second establishment, after attempting unsuccessfully to activate the Nutel machine by simply pressing buttons, Gauvin paid twenty dollars to the bartender, who posted one hundred credits to the machine and handed him a telephone calling card. Gauvin exhausted these credits without winning a prize, and then paid the bartender another twenty dollars for additional credits. Gauvin again exhausted the credits and did not win a prize.

The evidence was that each telephone calling card or access code number furnished four minutes of calling time for each dollar paid.[6] There was no testimony or other evidence of the rates charged by other vendors of telephone calling cards during the same time periods.

A sign prominently placed atop each machine contained a legend alerting potential patrons to the option to play the game for free, for an unlimited number of times, upon completion of

---

[6]Though there was evidence that Gauvin received a recorded message that the telephone access code number was invalid when he attempted to use one of the numbers for the first time almost six months after he acquired it, the Commonwealth expressly disclaimed at trial any contention that the calling cards were not authentic.

free play request cards.[7] There was testimony that the submission of a completed free play request card entitled a person to a number of game credits equivalent to those obtained incident to the purchase of a one dollar calling card (or, in other words, five game credits). Gauvin testified that he did not observe any free play request cards at either establishment during his undercover investigation, nor upon execution of the search warrant incident to which he seized the machines. However, Gauvin did not request a free play request card at either establishment, nor did he ask to be allowed to play either machine for free. At trial, several completed free play request cards obtained from Nutel's business records were submitted in evidence, though there was testimony calling into question the accuracy of the information supplied to complete the cards.[8]

*Discussion.* As we have observed, of the elements required to support conviction under G. L. c. 271, § 7, the defendant challenges only the element of price. For purposes of the statute, "price means 'something of value and not merely the formal or technical consideration, such as registering one's name or attending at a certain place, which might be sufficient consideration to support a contract.' " *Mobil Oil Corp.* v. *Attorney Gen.,* 361 Mass. 401, 406 (1972), quoting from *Commonwealth* v. *Heffner,* 304 Mass. 521, 523 (1939). "[T]he price must come from participants in the game in part at least as payments for their chances and . . . the indirect advantage to the [hosting establishment] of larger attendance is not in itself a price paid by participants." *Commonwealth* v. *Wall,* 295 Mass. 70, 74 (1936). Put another way, "the incidental increase in business attendant upon the use of promotional games . . . is not the type of consideration necessary to make [such] games lotteries." *Mobil Oil Corp.* v. *Attorney Gen., supra* at 407. Whether or not a particular arrangement constitutes a lottery within the coverage of the statute depends on the particular facts and circumstances of each case. See *Commonwealth* v. *Heffner, supra* at 524-525.

Based on *Mobil Oil Corp.,* the defendant argues that the games offered by the video machines were a permissible promo-

---

[7]The full text of the sign is set out in the Appendix to this opinion.

[8]Some of the addresses appeared to refer to locations that did not exist, or to nonresidential locations.

tion incidental to the sale of telephone calling cards and, in particular, that the prominently featured opportunity to play the games for free, without any related purchase, for an unlimited number of times, defeats the requisite statutory element that a price be paid. The Commonwealth, quoting from *Commonwealth* v. *Wall, supra* at 73, asserts in response that "a game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances." In our view, however, that particular expression within *Wall* did not survive *Mobil Oil Corp.*, since the court in *Mobil Oil Corp.* expressly recognized that a significant purpose of the promotional game was to increase sales, and thereby implicitly acknowledged that some (if not many) game participants also purchased a product. See *Mobil Oil Corp.* v. *Attorney Gen., supra* at 404. Instead, the court in *Mobil Oil Corp.* distinguished *Wall* and the other so-called "bank night" cases on the ground that game participants who chose to play without purchase were placed at no disadvantage in comparison to those who made purchases. See *id.* at 407. The essential test, consistent through both *Wall* and *Mobil Oil Corp.* and based on all the facts and circumstances of the particular case, is "not whether it was possible to win without paying," but whether those who chose to pay "were paying in part for the chance of a prize." *Commonwealth* v. *Wall, supra* at 73.

Measured against that test, we agree with the defendant that the Commonwealth's proof at trial failed to establish the required element of price. As we have observed, signs posted on each machine advised potential players that no purchase was necessary to play the game. The Commonwealth's suggestion that the "free play" option was illusory is without evidence to support it. The investigating officers made no attempt to take advantage of the free play option, and gave no testimony concerning any unsuccessful efforts by any other patrons to play for free.[9] Moreover, like the circumstances in *Mobil Oil Corp.*, and unlike those in *Wall*, the Commonwealth has

---

[9]We place no significance on the fact that some or all of the free play request cards submitted in evidence may have included inaccurate address information. See note 8, *supra.* The essential question is whether the posted

demonstrated no disadvantage to participants who chose to play for free as compared to those who made a purchase.[10] Finally, the Commonwealth presented no evidence to suggest that the price at which Nutel offered its telephone calling cards or access code numbers, with the attendant promotional game playing opportunity, was different from (much less higher than) the price at which comparable telephone calling card products were offered for sale by other vendors without the promotional game.[11] Taken as a whole, we conclude that the evidence did not establish that those who chose to purchase Nutel's telephone calling cards "were paying in part for the chance of a prize." *Commonwealth* v. *Wall*, 295 Mass. at 73.

---

free play option furnished an opportunity in reality for interested persons to play the game without purchase or payment, not whether such interested persons provided accurate personal information to avail themselves of that opportunity.

[10]Though Gauvin chose to purchase twenty dollars' worth of telephone access code numbers, with an attendant one hundred game play credits, there was no evidence concerning the optimum number of game play credits for a participant wishing to enjoy the game or win a prize. It is obvious that a greater number of game credits increases a participant's chance of winning, and obvious that some burden of inconvenience attends the completion of a free play request card. It is not obvious, however, and the Commonwealth presented no evidence to establish, either that five game play credits are so few, or that the burden of completing multiple free play request cards is so great, as to render the free play option illusory or impractical in fact.

[11]Though the Commonwealth advanced no argument in reliance on the case, we acknowledge that *Commonwealth* v. *Frate*, 405 Mass. 52, 53 n.1 (1989), sustained a conviction under G. L. c. 271, § 7, based on the use of an electronic machine, despite the presence of a notice on the machine advising that no purchase was necessary and that players could participate in the "sweepstakes" by mailing an entry form, with specified information, to a designated address. The court in *Frate* engaged in no discussion of the "free play option" in concluding that the evidence was sufficient to sustain the conviction. See *Commonwealth* v. *Frate*, *supra* at 54-55. It is unclear from the report of that case whether the defendant based any argument on a theory similar to that advanced by the defendant in the present case. In any event, the circumstances in *Frate* are dissimilar to those in the present case in two respects we consider material. First, in *Frate*, the game stood alone as an opportunity to win a prize based on chance, and was not offered as a promotional incident to the sale of a product. See *id.* at 53. Second, and of more significance measured against the statute and our cases, in *Frate*, the cumbersome requirement to request free play by mail, rather than immediately on the site of the game machine itself, appears rather evidently to pose a significant practical disadvantage to a player wishing to play for free as compared to a paying player. See *id.* at 53 n.1.

*Conclusion.* The evidence did not establish that the promotional game fostered by the defendant required payment in order to play a game with a chance for a prize. The judgments of conviction under G. L. c. 271, § 7, are accordingly reversed, and the findings are set aside. Judgments shall enter in favor of the defendant on both complaints.

*So ordered.*

APPENDIX.

"NO PURCHASE IS REQUIRED
OF A PHONE TICKET TO PLAY THIS
SALES PROMOTIONAL GAME

"IT'S NEW IN PRE-PAID PHONE TICKETS
YOU BUY ONLY THE AMOUNT YOU WANT!
$1, $5, $10, OR $20 PHONE TICKETS
FOR EACH $1.00 YOU RECEIVE UP TO A
4 MINUTE PHONE CALL

"NO PAYHONE [*sic*] USE FEES — NO CONNECT FEES
NO MONTHLY SERVICE CHARGES — EACH DOLLAR BUYS
A PIN NUMBER WITH UP TO A 4 MINUTE PHONE CALL.

"SEE RULES BELOW

"TO PLAY THIS SALES PROMOTIONAL REDEMPTION GAME FOR FREE WITHOUT HAVING TO PURCHASE A PHONE TICKET, JUST FILL OUT OUR INSTANT FREE PLAY REQUEST CARD AT ANY PARTICIPATING LOCATION WITH YOUR NAME, ADDRESS, CITY OR TOWN, STATE AND ZIP CODE. AFTER FILLING OUT THE FREE PLAY REQUEST CARD, YOU THEN CAN IMMEDIATELY RECEIVE AN INSTANT FREE PLAY WITHOUT PURCHASING A PHONE TICKET. YOU NEVER HAVE TO PURCHASE A PHONE TICKET TO PLAY ANY OF OUR SALES PROMOTIONAL GAMES. UNLIMITED FREE PLAY REQUESTS. YOU MUST BE AT LEAST 18 YEARS OLD, NOT AFFILIATED WITH SPONSORS, AND AGREE TO SUBMIT PROOF OF ELIGIBILITY UPON REQUEST. VOID WHERE REDEMPTION OR SALES PROMOTIONAL GAMES ARE PROHIBITED."